UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COLUMBIA UNITED PROVIDERS,
INC., et al.,

                    Plaintiffs,

        v.

STATE OF WASHINGTON, HEALTH
CARE AUTHORITY,

                    Defendant.

CASE NO. C12-5174BHS

ORDER DENYING MOTION
FOR PRELIMINARY
INJUNCTION

    This matter comes before the Court on Plaintiffs' motion for preliminary

injunction (Dkt. 17). The Court has considered the pleadings filed in support of and in

opposition to the motion and the remainder of the file and hereby denies the motion for

the reasons stated herein.

    As an initial matter, the Court notes that the findings of fact, conclusions of law,

and discussion of issues below, are based on the record presently before the Court and

solely for the purposes of deciding the instant motion for preliminary injunction.

# I. FACTUAL BACKGROUND

This action arises out of a dispute between Plaintiffs, two managed care organizations, Columbia United Providers, Inc. ("CUP") and Community Health Plan of Washington ("CHPW"), and Defendant Washington State Health Care Authority ("HCA").  Though HCA has previously contracted with Plaintiffs to provide managed care services to Washington Medicaid, Disability Lifeline, Children's Health Insurance Program, and Basic Health Plan (collectively, "Medicaid and Basic Health") beneficiaries in several counties, their current contracts expire on June 30, 2012.  Dkt. 17 at 1.  In accordance with a directive from the legislature, HCA recently concluded a bid procurement that consolidates Medicaid managed care and Basic Health.  The Requests for Proposal were issued on September 15, 2011, and bids were due by December 2, 2011.  Following the bid process, HCA selected five managed care organizations ("MCOs") as the successful bidders.  The contracts are to take effect on July 1, 2012. *Id.* at 3.

## A.    Parties

CUP is a Washington corporation that operates a community-based health plan. Dkt. 4 at 3.  CUP is located in Vancouver, Washington, and employs eighty staff in private sector wage positions.  *Id.*  CUP has served Medicaid and Basic Health beneficiaries in Washington for eighteen years.  *Id.*  CUP currently serves over 88% of Clark County residents enrolled in various health programs including Basic Health.  *Id.* CUP currently serves the third largest enrollment in the state's public health insurance

1  programs, providing access to health care services in communities where it maintains

2  provider networks and coordinates care.  *Id*.

3      CHPW is a not-for-profit health care services contractor that is closely affiliated

4  with nineteen community health centers in Washington.  *Id*.  CHPW operates as a health

5  service contractor providing for managed care services throughout the state.  *Id*. at 4.  It is

6  the sixth largest insurer in Washington and specializes in serving low income patients,

7  including those enrolled in Healthy Options, CHIP, Basic Health, and Medicare managed

8  care plans.  *Id*.

9      HCA is an agency of the state of Washington and is responsible for administering

10  the state's Medicaid plan pursuant to 42 U.S.C. § 1396a(a)(5) , and administers the Basic

11  Health Plan.  *Id*.

12  **B.**    **Overview of Plaintiffs' Allegations**

13      Plaintiffs assert that HCA procured the contractual agreements in violation of its

14  own Request for Proposal ("RFP"), and that these contracts violate state and federal laws

15  pertaining to Medicaid and the services provided to Medicaid and Basic Health

16  beneficiaries.  Dkt. 17 at 1-2.  Plaintiffs contend that the way in which HCA awarded the

17  contracts violated the RFP in that HCA ignored requirements intended to make the

18  bidding process fair, ensure the adequacy of the provider networks of the selected

19  bidders, and that the contracts violate federal and state regulations created by legislators

20  to protect the beneficiaries who will depend on the services provided by the selected

21  contractors.  *Id*. at 4.  HCA asserts that it did not award CUP any contracts because

22  CUP's bid was incomplete and was substantially more expensive than the winning bids.

Dkt. 25 at 3.  HCA selected CHPW as the successful bidder for twenty-eight of the thirty-two counties for which it submitted bids. Dkt. 24 at 2.

**C.    The Recent Bid Procurement**

HCA recently concluded a joint procurement that consolidates the purchasing of healthcare services for two health plans: Healthy Options and Basic Health.  Dkt. 30 at 2; *see generally,* Dkt. 30-1.  The RFP was issued on September 15, 2011, and the bids were due by December 2, 2011.  Dkt. 31 at 11-12.  HCA asserts that the expected benefits of the consolidation will be improved care, reduced costs, and expansion of managed care coverage.  Dkt. 30 at 2.

HCA selected five organizations as the apparently successful bidders ("ASBs"). Dkt. 30 at 3; Dkt. 31 at 2-3.  The RFP outlines a process by which HCA reviews bids and selects bidders, and HCA asserts that throughout the most recent bid selection process, it at all times abided by the RFP.  Dkt. 30 at 2, 5.  In its review process, HCA created evaluation teams to evaluate and score the "major sections of the bidders' proposals." Dkt. 24 at 8, Dkt. 20 at 5.  There were seven separate teams with completely different members. *Id*.  Each person reviewed the proposals independently before the team met as a group, at which point the group would discuss proposals and arrive at a consensus score.  Dkt. 30 at 5.  It is unclear exactly how each team finalized the proposals' scores, but HCA maintains that the bid responses were the only materials considered by the teams. *Id*.  HCA identified seven major areas of emphasis for the bid review, and a different team evaluated each area: Quality Assurance and Performance, Access to Care and Provider Network, Care Management, Utilization Management Program and

1   Authorization of Services and Grievance Systems, Program Integrity, Integrated Care and

2   Understanding the Changing Landscape of Managed Care, and Rates. *Id*. HCA claims

3   that CHPW was not a successful bidder in four counties because its proposed rates were

4   too high. Dkt. 25 at 3. CUP was not a successful bidder because (1) its proposed rates

5   were too high and (2) it underperformed in Quality Assurance, Integrated Care

6   Management, and Understanding the Changing Landscape of Managed Care. *Id*.

7   **D.     Rate Determination**

8          Before beginning the bid procurement, HCA retained Milliman, an actuarial

9   consulting firm that provides services to the healthcare industry, to determine rates to

10   current Healthy Options contractors by geographical service area. Dkt. 26 at 2.

11   Milliman determined that the rates paid to Clark County MCOs "would require a greater

12   adjustment than the rates paid to such organizations in other service areas." *Id*. The

13   selected bidders in Clark County submitted bids at the "low end of the rate ranges." Dkt.

14   17 at 54; Dkt. 24 at 11. HCA attributes the difference in rates to the level of

15   reimbursement paid to providers within the networks of the MCOs. Dkt. 26 at 2. CUP's

16   bid was at the high end of the Clark County rate range. *Id*.

17   **E.     Contracts Awarded**

18          HCA sent draft contracts to the successful bidders on March 2, 2012, and the

19   parties signed the contracts within the following eleven days. Dkt. 30 at 4-5. HCA is

20   now awaiting federal approval of the contract terms. Dkt. 32 at 2-3. HCA included what

21   it calls a "checklist" for the federal government wherein HCA explains how the contract

22   satisfies federal Medicaid requirements. *Id*.; *see* Dkts. 32-1 & 32-2. In addition, HCA is

ORDER - 5

1   conducting an ongoing network analysis which will conclude on May 16, 2012, on which

2   date a final decision about network adequacy will be made.  Dkt. 25 at 3.

3                              **II. PROCEDURAL HISTORY**

4          On February 29, 2012, Plaintiffs filed a complaint in Clark County Superior Court

5   alleging claims against HCA for violations of the Supremacy Clause of the United States

6   Constitution and Washington law and seeking injunctive and declaratory relief.  Dkt. 1-1

7   at 2-33.  Included with the complaint was a motion for temporary restraining order

8   ("TRO").  Dkt. 1-1 at 38-54.  On the same day, HCA removed the action to this Court.

9   Dkt. 1.  On March 1, 2012, Plaintiffs filed a motion for TRO in this Court.  Dkt. 4.  On

10  March 5, 2012, the Court held a hearing on the motion and denied the TRO.  Dkt. 12.  At

11  the hearing, the Court set an accelerated briefing schedule for Plaintiffs' motion for

12  preliminary injunction.  *Id*.

13         On March 27, 2012, Plaintiffs filed their motion for preliminary injunction.  Dkt.

14  17.  On April 3, 2012, HCA responded to the motion (Dkt. 24) and on April 5, 2012,

15  Plaintiffs replied (Dkt. 34).  On April 9, 2012, the Court held a hearing on Plaintiffs'

16  motion.  Dkt. 42.

17                                **III. DISCUSSION**

18         Plaintiffs seek a preliminary injunction to enjoin HCA from implementing

19  contracts it entered into with five MCOs ("successful bidders").  HCA maintains that the

20  injunction must be denied because Plaintiffs have failed to show a likelihood of success

21  on, or even raise serious questions going to, the merits of their arguments regarding

22

1  HCA's contracts with the successful bidders and the process that was used to award

2  them.

## A.  Standard

4  The court may issue a preliminary injunction where a party establishes (1) a

5  likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the

6  absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4)

7  that the public interest favors an injunction.  *Winter v. Natural Resources Defense*

8  *Council*, 555 U.S. 7, 20 (2008).  A party can also satisfy the first and third elements of

9  the test by raising serious questions going to the merits of its case and a balance of

10  hardships that tips sharply in its favor.  *Alliance for the Wild Rockies v. Cotrell*, 632 F.3d

11  1127, 1135, 632 F.3d at 1135 (9th Cir. 2011) (holding that the Ninth Circuit's "sliding

12  scale" approach continues to be valid following the *Winter* decision).

## B.  Merits of the Case

### 1.  Claims Brought as Unsuccessful Bidders

15  "Washington courts have given bidders a limited remedy to sue for injunctive

16  relief before a contract is signed."  *McCandlish Elec., Inc. v. Will Const. Co., Inc.*, 107

17  Wn. App. 85, 95 (2001) (citing *Peerless Food Prods., Inc. v. State*, 119 Wn. 2d 584, 590-

18  91 (1992)).  An aggrieved public bidder may sue to enjoin the award of a public contract.

19  *Dick Enters., Inc. v. Metro./King County*, 83 Wn. App. 566, 569 (1996).  However,

20  "[p]ost-contract injunctive suits by bidders would compete with the public interest in

21  preventing excessive taxation, and we will therefore not recognize them."  *Id*. at 572.

22

1    Here, Plaintiffs sought a TRO to enjoin HCA from entering into contracts with the

2    successful bidders.  Dkt. 4.  On March 5, 2012, the Court held a hearing on the motion

3    and denied the TRO.  *See* Dkt. 12.  On or about March 13, 2012, HCA executed its

4    contracts with the successful bidders.  Dkt. 17-5 at 5.  Accordingly, the Court concludes

5    that Plaintiffs' bid protest claims are moot.  *See BBG Group, LLC v. City of Monroe*, 96

6    Wn. App. 517, 521-22 (1999).

7        **2.      Compliance with Federal Medicaid Requirements**

8            **a.      Supremacy Clause**

9        The Ninth Circuit has held that "a plaintiff may bring suit under the Supremacy

10   Clause to enjoin implementation of a state law allegedly preempted by federal statute,

11   regardless of whether the federal statute at issue confers an express 'right' or cause of

12   action on the plaintiff."  *Indep. Living Center of S. Cal., Inc. v. Shewry*, 543 F.3d 1047,

13   1048 (2008).  A court may "infer preemption if there is an actual conflict between federal

14   and state law."  *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) (internal quotation

15   marks omitted).  In addition, "[c]onflict preemption is found where compliance with both

16   federal and state regulations is a physical impossibility, or where state law stands as an

17   obstacle to the accomplishment and execution of the full purposes and objectives of

18   Congress."  *Id.*

19       Here, Plaintiffs have failed to provide the Court with specific authority to support

20   their argument that a claim can be brought under the Supremacy Clause based on an

21   action by a state agency, such as HCA's procurement of bids and award of contracts, as

22   opposed to a claim based on an actual statute or regulation.  Accordingly, the Court

1  concludes that Plaintiffs have not raised serious questions as to whether they will prevail

2  on the merits of their claims based on the Supremacy Clause.

3        Regardless, even assuming Plaintiffs can show that their claims are properly

4  brought under the Supremacy Clause, the Court concludes, for the reasons discussed

5  below, that they have failed to raise serious questions with respect to the merits of their

6  federal claims.

7              **b.     HCA's Compliance with Federal Medicaid Requirements**

8        The Medicaid Act allows states to require Medicaid beneficiaries to enroll in

9  MCOs as a condition of receiving benefits, provided certain requirements are met by the

10  state.  42 U.S.C. § 1396u-2(a).  One of the requirements is that the managed care

11  organizations have sufficient provider networks to serve the Medicaid beneficiaries.  *Id.*

12  §§ 1396b(m)(1)(A)(i), 1396u-2(b)(5).  Thus, the Medicaid Act permits a state to restrict

13  the number of provider agreements with MCOs only to the extent that "such restriction

14  does not substantially impair access to services."  *Id.* § 1396u-2(a)(1)(A)(ii).  Under the

15  Act, each MCO must provide

16        the State and the Secretary with adequate assurances (in a time and manner
        determined by the Secretary) that the organization, with respect to a service
17        area, has the capacity to serve the expected enrollment in such service area,
        including assurances that the organization--
18              (A) offers an appropriate range of services and access to preventive
        and primary care services for the population expected to be enrolled in such
19        service area, and
              (B) maintains a sufficient number, mix, and geographic distribution
20        of providers of services.

21  *Id.* § 1396u-2(b)(5).  In *G. v. Hawaii, Dept. of Human Servs.*, 703 F. Supp. 2d 1078, 1091

22  (2010), the district court points out that the Secretary has made the determination for the

time and manner in which assurances must be provided in 42 C.F.R. § 438.207, providing

in relevant part:

> (a) Basic rule. The State must ensure, through its contracts, that each MCO . . . gives assurances to the State and provides supporting documentation that demonstrates that it has the capacity to serve the expected enrollment in its service area in accordance with the State's standards for access to care under this subpart.
> (b) Nature of supporting documentation. Each MCO . . . must submit documentation to the State, in a format specified by the State to demonstrate that it complies with the following requirements:
> (1) Offers an appropriate range of preventive, primary care, and specialty services that is adequate for the anticipated number of enrollees for the service area.
> (2) Maintains a network of providers that is sufficient in number, mix, and geographic distribution to meet the needs of the anticipated number of enrollees in the service area.
> (c) Timing of documentation. Each MCO . . .  must submit the documentation described in paragraph (b) of this section as specified by the State, but no less frequently than the following:
> (1) At the time it enters into a contract with the State.
> (2) At any time there has been a significant change (as defined by the State) in the MCO's . . . operations that would affect adequate capacity and services, including-
> (i) Changes in MCO . . . benefits, geographic service area or payments; or
> (ii) Enrollment of a new population in the MCO . . . .

42 C.F.R. § 438.207.

Here, Plaintiffs contend that "HCA's failure to verify and establish network

adequacy at the time of contracting, and its decision to contract with health plans without

regard to whether those plans can deliver on its promise to construct adequate networks

in all counties awarded to it, violates federal Medicaid requirements."  Dkt. 17 at 16-17.

Plaintiffs argue that based on the documentation submitted by the successful bidders

regarding network adequacy for Clark and Wahkiakum counties, it cannot "truthfully"

1    provide adequate assurances that the successful bidders have the capacity to serve the

2    expected enrollment through adequate primary care and other services, as required by 42

3    U.S.C. § 1396u-2(b)(5) & 42 C.F.R. § 438.207(b)(1) & (2).  *Id.* at 17.  In addition,

4    Plaintiffs maintain that HCA also violated federal regulations that require states to ensure

5    that its contracts with MCOs "have appropriate provider networks 'supported by written

6    agreements' and 'sufficient to provide adequate access to all services covered under the

7    contract.'"  *Id.* (quoting 42 C.F.R. § 438.206(b)(1)).  Finally, Plaintiffs argue that HCA's

8    procurement of the bids did not comply with federal law requirements that MCO provider

9    payments be "actuarially sound."   Dkt. 17 at 18 (quoting 42 U.S.C.§ 1396b(m)(2)(A)(iii)

10   & 42 C.F.R. § 438.6(c).

11                     **i.     Network Adequacy**

12          In *G. v. Hawaii*, 703 F. Supp. 2d at 1092, the district court summarized the Ninth

13   Circuit's opinion on the issue of adequate assurances in a previous case: "The Ninth

14   Circuit explained that, 'it is the existence of assurances of future performance, and not the

15   present status of provider networks, that is mandated by 42 U.S.C. § 1396u-2(b)(5).'"  *Id.*

16   (quoting *Hawaii Coal. For Health v. Hawaii*, 365 Fed. Appx. 874, 876 (9th Cir. 2010)).

17   Thus, the Ninth Circuit held that the plaintiff's claim that neither of the successful

18   bidders "had an established network of providers at contract signing failed to state a

19   claim upon which relief could be granted."  *Id.*

20          Here, Plaintiffs have failed to show that there are serious questions as to whether

21   they will prevail on the merits of this claim.  First, to the extent Plaintiffs are attempting

22   to argue that HCA was required, under federal law, to find that the successful bidders had

1  adequate networks of providers at the time it signed the contracts with them, the Court

2  rejects this argument and adopts the reasoning given by the Ninth Circuit in *Hawaii*

3  *Coalition for Health* and the district court in *G. v. Hawaii*.  In addition, Plaintiffs have

4  failed to show that there are serious questions regarding HCA's compliance with federal

5  Medicaid law in the actual terms of its RFP and contracts.  HCA has shown that it

6  required a certain level of assurances at the time of contract award (through the terms of

7  the RFP) and that that the actual contract itself gives HCA the ability to continue its

8  network analysis and take certain steps, including termination of the contract, if the

9  MCOs fail to meet HCA's requirements in showing an adequate network of providers.

10  Exh. C-2 §§5.1.4, 5.1.1 & 2.34.  Because the Court has agreed with its sister courts that

11  an adequate network of providers is not required at the time of contract and, in this case,

12  HCA's network analysis is still ongoing, the Court cannot conclude that HCA has

13  violated federal requirements regarding network adequacy.

14       In addition, as HCA points out, the Court is not the only avenue by which the

15  adequacy of HCA's contracts with MCOs will be assessed.  *See* Dkt. 24 at 15 n.24.  In

16  addition to HCA's ongoing network analysis, the state is required to make assurances to

17  the Department of Health and Human Services ("HHS") as part of its Medicaid State

18  Plan.  *See* 42 C.F.R. § 438.50(c).  Accordingly, if HHS determines that a state has not

19  complied with the federal requirements, it can take enforcement action, such as

20  withholding federal funds.  42 U.S.C. § 1396c.

21

22

1 |          ii.      **Actuarially Sound**

2 |          Plaintiffs also allege that HCA's procurement violated federal provisions that

3 | require "MCO provider payments be 'actuarially sound.'" Dkt. 17 at 18 (quoting 42

4 | U.S.C. § 1396b(m)(2)(A)(iii) & 42 C.F.R. § 438.6(c)).  Section 1396b(m)(2)(A)(iii)

5 | requires that payments made to MCOs by the state be "actuarially sound."   The statute

6 | does not state that payments to providers from the MCOs be actuarially sound.

7 |          In issuing the RFP, HCA established a rate band of 13.5% below trended historical

8 | cost for Clark County.  Dkt. 17 at 18; *see* Dkt. 26.  According to HCA, this is because

9 | providers in Clark County had received higher payments than the statewide average,

10 | specifically from CUP, who is currently serving much of the Medicaid and Basic Health

11 | beneficiaries in that county.  Dkt. 26 at 2-3.  The successful bidders were required to

12 | submit certifications that the bid rates were sound.  *Id*.  Plaintiffs argue that such

13 | certification gives little assurance where the successful bidders have yet to execute

14 | contracts with the providers.  Dkt. 17 at 18-19.

15 |          HCA required the successful bidders to submit certifications that their bid rates

16 | were actuarially sound.  Dkt. 26.  As discussed above, HCA is conducting an ongoing

17 | network analysis to determine the adequacy of the provider networks of the successful

18 | bidders.  If there is an issue regarding the successful bidders' ability to sign contracts

19 | with providers because of the rates they negotiated with HCA, it will be up to HCA and

20 | the successful bidders to deal with the issue as it arises.  The Court concludes that

21 | Plaintiffs have failed to show serious questions going to the merits of their claim

22 | regarding the successful bidders and the "actuarially sound" requirement.

### 3.     State Law Requirements Regarding Network Adequacy

Plaintiffs argue in their motion that "Washington Medicaid and insurance laws and rules impose nearly identical network adequacy requirements, HCA's actions also violate those laws and regulations."  Dkt. 17 at 19 (citing RCW 74.09.522(5) & WAC 284-43-200(1) & (4)).  For the same reasons discussed above regarding HCA's compliance with federal Medicaid statutes and regulations, the Court concludes that Plaintiffs have failed to raise serious questions regarding the merits of their claim that HCA's actions were contrary to Washington law regarding network adequacy.

### 4.     Arbitrary and Capricious Actions in Violation of State Law

"The Washington State Constitution gives superior courts the inherent authority to review both judicial and non-judicial actions of administrative agencies."  *Foster v. King County*, 83 Wn. App. 339, 346 (1996) (citing Wa. Const. art. IV, § 6 & *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn. 2d 690, 693-94 (1983)).  However, "[t]he scope of such review is limited to whether the hearing officer's actions were arbitrary, capricious, or illegal, thus violating a claimant's fundamental right to be free from such action."  *Id.* (citing *Bridle Trails Cmty. Club v. City of Bellevue*, 45 Wn. App. 248, 251-52 (1986)).  Finally, "[a] court has the discretion to refuse to exercise its inherent power of review so long as it provides tenable reasons for its decision."  *Id.* (citing *Birch Bay Trailer Sales, Inc. v. Whatcom County*, 65 Wn. App. 739, 746, *review denied*, 119 Wn. 2d 1023 (1992); *see Raynes v. City of Leavenworth*, 118 Wn. 2d 237, 250 (1992) (stating that "[i]f the court can reasonably conceive of any facts which justify a legislative determination, then that determination will be sustained").

1    In their motion, Plaintiffs maintain that HCA's actions were arbitrary and

2  capricious in that they: (1) violated Washington Medicaid and insurance laws and rules

3  regarding network adequacy requirements for the same reasons it violated the

4  corresponding federal requirements; (2) failed to follow the Washington legislature's

5  direction that HCA's contract evaluation significantly value factors such as quality and

6  accessibility of care; (3) violated state law requirements that HCA follow its own

7  procurement procedures and terms of the RFP; (4) provided an ineffective and deficient

8  bid protest process; and (5) made adjustments to the bid scoring that were irrational and

9  arbitrary.

10              **a.    Violated State Law Regarding Network Adequacy**

11    As discussed above, the Court has concluded that Plaintiffs have failed to show

12  that there are serious questions going to the merits of whether HCA's bid procurement

13  and award of contracts violated federal or state law regarding network adequacy.

14  Accordingly, Plaintiffs cannot show that there are serious questions going to the merits of

15  their claim that HCA's actions related to network adequacy were arbitrary and capricious

16  or contrary to law.

17              **b.    Legislature's Direction**

18    Plaintiffs argue that HCA "flouted the Washington legislature's direction that its

19  contract evaluation 'significant[ly] value' factors such as quality and accessibility (and,

20  by inference, not give paramount importance to rates, as HCA did in weighing rates far

21  more heavily than other aspects of the bid and using rates as a means of disqualifying

22  CUP from serving Clark County, despite its robust provider network)." Dkt. 17 at 19-10

1    (quoting RCW 74.09.522(5)).  The Court concludes Plaintiffs have failed to show that

2    HCA acted in an arbitrary or capricious manner, or contrary to law, based on this

3    direction from the Legislature.  Plaintiffs fail to acknowledge that the Legislature also

4    imposed the following requirement on the Authority:

> In its procurement of contractors for delivery of medical managed care
> services for nondisabled, nonelderly persons, the medical assistance
> program shall (a) place substantial emphasis upon price competition in the
> selection of successful bidders; and (b) not require delivery of any services
> that would increase the actuarial cost of service beyond the levels included
> in current healthy options contracts.

Second Engrossed Substitute House Bill 1087, Laws of 2011, 1st Spec. Sess., ch. 50,

§ 213(32).

The Court concludes that Plaintiffs have failed to show there are serious questions

going to the merits of whether HCA acted in an arbitrary and capricious fashion, or

contrary to law, in attempting to implement competing directions from the Legislature to

value both quality care and lower rates.

### c.    State Law Requirements to Follow the RFP

Plaintiffs maintain HCA's actions were arbitrary and capricious in failing to

adhere to the state law requirement that it follow its own RFP.  Dkt. 17.

### i.    Inadequacy of the Provider Networks

Plaintiffs currently serve tens of thousands of managed Medicaid and Basic Health

members in several counties in Washington.  Dkt. 17 at 3.  In their motion, they allege

that the successful bidders will not have adequate provider networks in place by July 1,

2012, when the contracts are to be implemented.  *Id.* at 4.  Network adequacy was

1 determined by evaluating whether the bidder could assemble enough medical providers to

2 serve the Medicaid and Basic Health enrollees.  Dkt. 25 at 2.

3       According to HCA, in order to qualify as a successful bidder, a bidder would have

4 to receive an average score of at least 75 and a "network adequacy" score of at least 60.

5 Dkt. 25 at 2-3.  The evaluation team for this area recommended that only bidders

6 receiving scores over 75 qualify as apparently successful bidders, but ultimately, HCA

7 management decided to reduce the requirement to a minimum of 60 in each geographical

8 service area.  Dkt. 25 at 2.  This change was made in accordance with RFP Sections B-4

9 and E-6 and applied equally to all bidders.  Dkt. 25 at 2-3.  According to HCA, this meant

10 that providers had to have at least 60% of the required network by the time they

11 submitted their bids, with the expectation that they have 90% or above in place prior to

12 July 1, 2012.  Dkt. 25 at 3.

13       HCA, in executing the contracts, set May 16, 2012, as the date it would complete

14 its network analysis and make final determinations regarding network adequacy.  Dkt. 25

15 at 3.  Even after that date has passed, according to HCA, they will continue monitoring

16 the successful bidders' network adequacy.  *Id*.  If, at the time the contract is implemented

17 in July, or presumably, on the May 16, 2012, deadline, the successful bidders do not have

18 an adequate network in place, HCA may terminate a successful bidder's contract for

19 specific service areas, but Plaintiffs argue that this would nevertheless disrupt patients'

20 access to services.  Dkt. 17 at 4.

21       Plaintiffs allege that the procurement and execution of the contracts with the

22 successful bidders did not follow the RFP itself at Section C, § 3.3, because the

1    successful bidders had not shown that they had adequate networks in place at the time of

2    the contract signing and because the execution took place before HCA had completed its

3    network analysis. Dkt. 17 at 9.  As stated above, HCA will make a final decision

4    regarding network adequacy on or before May 16, 2012.  Dkt. 30 at 4.

5        Currently, the five successful bidders have been tentatively assigned counties for

6    services beginning July 1, 2012.  *Id.*  The assignments are not final until the networks of

7    the successful bidders have been re-examined and verified.  Dkt. 30 at 4.  Plaintiffs

8    maintain that HCA ignored the RFP requirements and, instead of conducting a

9    meaningful analysis of network adequacy, HCA contracted with the successful bidders

10   that offered the lowest bid, regardless of their ability to ensure services to Medicaid and

11   Basic Health beneficiaries.  Dkt. 17 at 5-10.  Plaintiffs are dissatisfied with the manner in

12   which the team reviewed the bidders' network adequacy and the conclusions the team

13   eventually made.  Dkt. 17 at 12.  One specific point Plaintiffs criticize is that the network

14   adequacy evaluation team did not contact any of the bidders' proposed subcontractors to

15   ensure that the bidders did or could have an adequate network of providers.  Dkt. 17 at

16   14.

17       Plaintiffs' main contentions regarding HCA's evaluation of network adequacy

18   under the RFP involve: (1) the provision at § 3.3, stating that successful bidders must

19   show they have adequate networks in place at the time of contract signing; and (2) that

20   HCA failed to conduct a meaningful analysis of the successful bidders' network

21   adequacy at the time they reviewed the bids.  Section 3.3 of the RFP states: "Adequate

22   Network:  No Bidder will be awarded a contract in a service area in which the Bidder

1   does not have an adequate network of providers as evidenced by network analysis." Dkt.

2   17-3 at 31.  Plaintiffs argue that because HCA did not require the successful bidders to

3   have an adequate network of providers to meet federal and state Medicaid standards at

4   the time of contracting, HCA violated the RFP.  HCA maintains that section 3.3 must be

5   taken in context with other provisions in the RFP that building an adequate network of

6   providers would be an ongoing process for those bidders who did not currently provide

7   services in the counties they succeeded in.  *See* Dkt. 24 at 15-16.  As an example, section

8   C § 2.4 states that:

9           After executing the contract resulting from this Procurement, but
        prior to the contractors providing services to enrollee, HCA will review the
10      contractors' readiness to begin providing services.  The review will be to
        determine whether the contractors are carrying-out [sic] their
11      implementation plans as submitted in response to this procurement.  If
        HCA determines that any contractor will not be ready to begin services on
12      July 1, 2012 it may, at its sole discretion, withhold enrollment and require
        corrective action or terminate the Contract.

13  Dkt. 17-3 at 23.

14          The Court agrees with HCA that the terms of the RFP have to be taken in context

15  with each other.  In addition, the Court notes that even the plain language of section 3.3

16  suggests that the provisions itself  may not require complete network adequacy at the

17  time of contracting.  The provision requires that bidders provide an adequate network of

18  providers "as evidenced by *network analysis*."  Dkt. 17-3 at 31 (emphasis added).  As

19  HCA has stated, its network analysis was ongoing even after the contracts were signed

20  and will conclude on May 16, 2012, at which time the successful bidders will be required

21  to show an adequate network of providers.

22

1                       **ii.**      **Lack of Acceptable Letters of Commitment**

2          Though the RFP instructs bidders to submit "written letters of commitment" from

3 providers in the bidders' network, evidencing the adequacy of the network, Plaintiffs

4 allege that the successful bidders with whom HCA contracted were able to procure only

5 letters expressing an *intent* to negotiate with the bidder.  Dkt. 17 at 9.  HCA maintains

6 that, in accordance with the RFP, it required bidders to have "contracts or letters of

7 commitment with the providers they proposed as part of their network."  Dkt. 25 at 2,

8 Dkt. 30 at 4.

9          As an example of a lack of acceptable letters, Plaintiffs allege that Centene, a

10 successful bidder with whom HCA has contracted for services in Clark and Wahkiakum

11 counties, submitted a letter of intent stating generically, "[n]etwork agrees to negotiate in

12 good faith to timely enter into a mutually acceptable network access agreement . . .

13 pursuant to which network will enter into a Provider Agreement . . . that is acceptable to

14 Plan with those of its participating PPO Network Providers that are selected by Plan and

15 that are willing to participate, to provide Covered Services as required by the State of

16 Washington's Health Care Authority."  Dkt. 17-10 at 2.

17          However, this letter of commitment, upon which Centene's bid rests, does not

18 bind or actually commit Centene to contract with any particular healthcare providers in

19 the area.  Dkt. 17 at 13.  Plaintiffs allege that, in essence, Centene's bid submission to

20 HCA, which led to the contractual agreement between the two, included contact

21 information for a variety of providers without any documentation to evidence that such

22 providers have agreed to contract, or were even considering contracting, with Centene.

1    *Id.* Plaintiffs make similar complaints about the contracts awarded to Molina in Clark

2    County and United Healthcare in Wahkiakum County. Dkt. 17 at 15.

3         As stated above, it is up to HCA to determine whether the bidders' letters and

4    other materials were sufficient to meet the requirements of the RFP in order to be

5    awarded the contract.  HCA was satisfied with the letters of commitment submitted by

6    the successful bidders to evidence their ability to put together an adequate network of

7    providers by July 1, 2012.  Plaintiffs have failed to show serious questions regarding

8    whether these letters were insufficient to meet the requirements laid out in the RFP and

9    thus, that HCA acted in an arbitrary and capricious manner, or contrary to law, in

10   accepting them.

11                  **iii.    Incomplete and Unacceptable Plans**

12        Finally, Plaintiffs argue that HCA violated the RFP's requirement that bidders

13   submit a "comprehensive Access to Care and Provider Network Implementation and

14   Operations Plan that describes in detail how the Bidder will establish and operate a

15   network of providers that meets all contractual and regulatory requirements and is

16   sufficient to fully meet the needs of the population to be served."  Dkt. 17-3, Section C,

17   § 4.4; Dkt. 17 at 10.  Centene and United Healthcare apparently submitted plans for

18   Wahkiakum County that included only a single nurse practitioner from that county, and

19   all other listed providers were located in other counties.  *Id.* at 15.  CUP submitted a bid

20   for Wahkiakum County with a much more comprehensive plan, and currently provides

21   services to "virtually every publicly insured patient in the Healthy Options, CHIP and

22   Basic Health Plan programs," in that county, but lost its contract with HCA.  *Id.*  at 15.

1   HCA confirmed during depositions that CUP had an adequate network in Wahkiakum

2   County.  Dkt. 17-7 at 20-21.  Nevertheless, Centene was a successful bidder in

3   Wahkiakum County and CUP was not. Dkt. 17 at 15.

4         Section C, § 4.3, of the RFP required the bidders to submit plans that show how

5   the bidders "would have in-place" an adequate network of providers by July 1, 2012.

6   HCA had the authority to decide whether the bidders' plans were sufficient to assure

7   HCA that such a network could be in place by July 1, 2012, and the fact that Plaintiffs

8   believe the plans submitted by the successful bidders were insufficient does not rise to the

9   level of showing an arbitrary or capricious action on the part of HCA.

10           **iv.    Conformity with RFP**

11         The Court concludes that Plaintiffs have failed to raise serious questions going to

12   the merits of their claim that HCA violated the terms of the RFP in procuring and

13   executing the contracts with the successful bidders.  In analyzing the question of whether

14   HCA's actions were arbitrary, capricious, or contrary to law, "[i]f the court can

15   reasonably conceive of any facts which justify a legislative determination, then that

16   determination will be sustained."  The Court concludes that HCA has provided sufficient

17   facts to support its actions in procuring and executing the contracts with the successful

18   bidders.

19        **d.    Bid Protest Process**

20         Plaintiffs filed protests after HCA selected the winning bidders.  Dkt. 29 at 2, 4.

21   CUP challenged the selection process, but upon review by staff independent of those who

22   had been involved in the bid procurement, the protest was found to lack merit and HCA

1  dismissed it.  *Id*. at 2, 4-5.  CHPW challenged the process of assigning territory to the

2  successful bidders, but the independent reviewer found that this protest also lacked merit

3  and dismissed it.  Dkt. 24 at 11.  HCA provided information and documents, as well as

4  responses to the bid protests.  *Id*.  HCA also explained the procurement methodology to

5  Plaintiffs verbally and in writing.  *Id*. at 4-5. HCA found no reason to change the contract

6  awards, and maintains that the protests were reviewed in a manner that was timely and

7  consistent with accepted and historical practice.  *Id*. at 2-3, 5-6.

8         Even if the Court accepts as true Plaintiffs' allegations of fact regarding the way in

9  which HCA conducted its bid protest process (*see* Dkt. 17 at 20-21), the Court concludes

10 that Plaintiffs have not raised serious questions as to whether HCA acted in an arbitrary

11 and capricious manner or contrary to law.  In the context of a challenge to an action based

12 on allegations that the action is arbitrary and capricious, the Court need only find that it

13 can reasonably conceive of "any facts to justify" HCA's determination, and that

14 determination will be sustained.  HCA states that it reviewed Plaintiffs' bids and bid

15 protests and found that the protests did not meet the allowable grounds to reverse the

16 substantive results of the procurement.  *See* Dkt. 29.  HCA has supported its decision

17 with sufficient facts for the Court to conclude that Plaintiffs have not shown serious

18 questions going to the merits of this claim.

19              **e.     Adjustments to Bid Scoring**

20        Plaintiffs acknowledge that the terms of the RFP gave HCA the authority to make

21 "equitable adjustments" to the bid scoring to ensure that the successful bidders "will best

22 meet the needs of HCA."  RFP Section E, § 6.3; *see* Dkt. 17 at 21-22.  Plaintiffs argue

1  that HCA used this authority in an arbitrary and irrational fashion in permitting bidders

2  with network adequacy scores of 60, as opposed to the original requirement of 75, to

3  qualify as an apparently successful bidder.  Plaintiffs complain that HCA did not adjust

4  the score for bidders with high network adequacy scores to compensate for the

5  adjustment given to bidders with low network adequacy scores.  Plaintiffs also complain

6  about HCA's use of software that they claim HCA "knew was generating faulty and

7  anomalous data."  Dkt. 17 at 22.  HCA states that its purpose of requiring a network

8  adequacy score of 60 was to ensure that successful bidders could meet the access

9  requirements by July 1, 2012.  Dkt. 25 at 2-3.  In addition, the purpose of lowering the

10  requirement to 60 was to increase "the likelihood that a bidder would be named a

11  successful bidder, thus increasing access and client choice."  Dkt. 24 at 9; *see* Dkt. 25 at

12  2-3.

13       The RFP stated that "HCA management shall be guided, but not bound, by the

14  scores awarded by evaluators."  HCA has supported its decision to alter the bid scoring

15  with sufficient facts for the Court to conclude that Plaintiffs have not shown serious

16  questions going to the merits of whether HCA acted in an arbitrary and capricious

17  manner.  *See Raynes*, 118 Wn. 2d at 250 (stating that "[i]f the court can "reasonably

18  conceive of any facts which justify a legislative determination, then that determination

19  will be sustained").

20       **f.    Conclusion**

21       "Arbitrary and capricious means 'willful and unreasoning action, taken without

22  regard to or consideration of the facts and circumstances surrounding the action.'"

1   *Foster*, 83 Wn. App. at 347 (quoting *Kerr-Belmark Constr. Co. v. City Council*, 36 Wn.

2   App. 370, 373, *review denied*, 101 Wn. 2d 1018 (1984)).  The Court concludes that, even

3   taking Plaintiffs allegations as true, they have failed to "clearly demonstrate that [HCA's]

4   actions were arbitrary, capricious, or contrary to law." *Foster*, 83 Wn. App. at 346.

5   **C.**    **Remaining Factors**

6         The Court assumes that the factors of irreparability of harm and the balance of

7   hardships weigh in Plaintiffs' favor in that, absent this injunction, they will lose the

8   beneficiaries they are currently serving when the contracts with the successful bidders are

9   implemented on July 1, 2012, and that CUP will likely go out of business. *See* Dkts. 17

10   & 34.  However, the Court concludes that Plaintiffs have failed to show that the balance

11   of hardships tip *sharply* in their favor, as HCA has shown hardship that it would face

12   with an injunction that prevented it from implementing contracts with MCOs who are

13   scheduled to begin serving Medicaid and Basic Health beneficiaries in a matter of

14   months.  Finally, the Court concludes that the public interest factor weighs in favor of

15   HCA.  Although Plaintiffs have stated that the Medicaid and Basic Health beneficiaries

16   who are to be served by the successful bidders may suffer if the contracts are allowed to

17   be implemented, Plaintiffs have failed to convince the Court that this is the likely result if

18   an injunction is not issued.  In addition, HCA has shown a public interest to taxpayers in

19   allowing HCA to complete the process it has undertaken in executing these contracts and

20   allowing the successful bidders to move forward to provide the medical services to the

21   beneficiaries at a cost that is beneficial to taxpayers.

22

1

**IV. ORDER**

2      Therefore, it is hereby **ORDERED** that Plaintiffs' motion for preliminary

3 injunction (Dkt. 17) is **DENIED**.

4      Dated this 25th day of April, 2012.

5

6

7                              BENJAMIN H. SETTLE
                           United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 26